UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                   :

RICHARD SILLS,

                Plaintiff,

     -v.-

THE RONALD REAGAN PRESIDENTIAL
FOUNDATION, INC.,

                Defendant.

-------------------------------------------------------------x



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/28/09

09 Civ. 1188 (GEL)

**OPINION AND ORDER**

Keith S. Barnett, New York, NY, for plaintiff.

Mark A. Robertson, Erica Reed, Gregory B. Wood, Sarah Silbert, Fulbright & Jaworski L.L.P., New York, NY, and Los Angeles, CA, for defendant.

GERARD E. LYNCH, District Judge:

       Plaintiff Richard Sills filed this action in the Supreme Court of New York for New York County alleging that $200,000 he donated to defendant The Ronald Reagan Foundation, Inc. ("the Foundation") to be used for establishing educational programs at the Foundation's Presidential Learning Center was not used as he specified. Plaintiff seeks an accounting plus compensatory damages and attorneys' fees. Defendant removed the case to this court, and now moves to dismiss for lack of personal jurisdiction or, in the alternative, to transfer the case to the Central District of California. The motion will be denied.

**BACKGROUND**

       The Foundation is a California not-for-profit corporation, which operates out of the Ronald Reagan Presidential Library ("the Library") in Simi Valley, California, within the

Central District of California.  (Blackwood Decl. ¶ 3; Sills Decl. ¶ 10.)[1]  The Foundation's

mission is to "preserve the timeless ideals" of former President Ronald Reagan.  (Blackwood

Decl. ¶ 4.)  In furtherance of this mission, the Foundation primarily supports four programs, all

based in California: the Ronald Reagan Presidential Library and Museum, the Presidential

Learning Center, the Center for Public Affairs, and the Air Force One Pavilion.  (Id.)

The Foundation has over seventy-five employees, all of whom work at the Library's

facilities in California.  (Id. ¶ 11.)  The Foundation has no offices, facilities, employees, mailing

address, telephone number, bank account, or real property in New York.  (Id. ¶ 15.)  The

Foundation is not registered to do business in this state.  (Id. ¶ 15(g).  It is, however, registered

with the State of New York as a charitable organization pursuant to Executive Law Article 7-A,

which enables the Foundation to engage in fundraising in the state.  (See id. ¶ 15(g); Website of

the Office of the New York State Attorney General, Charities Bureau Registry Search,

http://bartlett.oag.state.ny.us/Char_Forms/search_charities.jsp.[2])  According to the Foundation's

2003 and 2004 federal tax returns (the only years which were provided), the Foundation files

copies of its tax returns with the State of New York.  (Sills Decl. ¶ 46; Sills Decl. Exs. L & M.)

Duke Blackwood, the Foundation's executive director, states that defendant does not

advertise in New York, except incidentally via its website.  (Blackwood Decl. ¶ 15(j).)  The

---

[1]  The following facts are drawn primarily from plaintiff's complaint and the parties'
declarations and accompanying exhibits submitted in support of the present motion and are
construed in a light most favorable to plaintiff.

[2]  The Foundation – through its executive director – states simply that it has a license to
ask for donations in New York.  (Blackwood Decl. ¶ 15(g).)  In view of the registration
information listed by the Office of the Attorney General of New York, the Court takes judicial
notice of the fact that this license is pursuant to New York Executive Law Article 7-A.  Fed. R.
Evid. 201.

Foundation does, however, maintain a mass mailing list for sending invitations to events and requests for donations, and Blackwood conspicuously does not state that these mass mailings are not sent to persons residing in New York. (Id. ¶ 10.) Whether or not these mailings are sent into New York, the mass solicitations are not sent to the Foundation's major donors, such as plaintiff, who instead are solicited through a smaller "major donor" list. (Id.) The Foundation has sponsored a few fundraising events in New York. (Id. ¶ 9; Sills Decl. ¶ 38-39.)

Plaintiff Sills, a New York resident (Sills Decl. ¶ 4), is a long-time and substantial donor to the Foundation. Between 1997 and 2005, Sills gave a total of $646,500 to the Foundation through twenty-one separate donations. (Id. ¶¶ 44-45; id. Ex. K.) Plaintiff's donative relationship with the Foundation dates back to 1997, when he received a letter solicitation mailed to his apartment in New York City. (Id. ¶ 15.) That letter sought, and Sills provided, a $1,000 donation, which in turn, made Sills a member of the Library's Chairman Club. (Id. ¶ 15.) Following this initial donation, Sills received annual correspondence from the Foundation requesting similar membership donations, and between 1999 and 2005, Sills made six additional $1,000 donations. (Id. ¶¶ 16-17; id. Ex. K.) The Foundation also solicited plaintiff for other causes. In 1998 and 1998, the Foundation sent Sills a number of letters seeking donations, and Sills periodically made contributions in response. (Id. ¶¶ 18-20.)

In early 2000, Steve Forbes, a board member of the Foundation, invited Sills to a fundraising luncheon at Forbes' apartment in New York City. (Id. ¶¶ 21-22.) Sills attended the luncheon, and thereafter donated $100,000 to the Foundation to help establish the Presidential Learning Center. (Id. ¶ 23; compl. ¶ 9.) This sizable donation spawned further solicitation of Sills (coupled with expressions of gratitude for the support already given), in the form of both telephone calls and letters from board members and other agents of the Foundation, seeking

3

further contributions. (Sills Decl. ¶¶ 24-27.) Sills asserts that as a direct result of these solicitations, he made additional contributions of $100,000 each in 2001, 2002 and 2003, for the sole purpose of establishing various educational programs within the Presidential Learning Center. (Id. ¶ 28; compl. ¶¶ 11, 14.) In 2002 the executive director of the Foundation told Sills that his donations had singlehandedly enabled the Foundation's educational programs to exist for the past three years. (Sills Decl. ¶ 29.)[3]

Beyond solicitations for monetary donations, Sills received several letters a year from the Foundation inviting plaintiff to events in California, which he frequently attended. (Id. ¶¶ 42-43.) In December 2003, Blackwood and Erica Jolles – who appears to have been the Foundation's director of development – traveled to New York to meet with one of the Foundation's trustees as well as potential donors. (Blackwood Decl. ¶¶ 17, 22.) While in New York, Blackwood and Jolles had dinner with Sills and visited his home. (Id. ¶ 17.) The purpose of the visit, according to Blackwood, was for Blackwood and Jolles, who were new to their respective positions, to introduce themselves to Sills in person. (Id.) During the visit they discussed generally the activities of the Foundation and a proposed donation by Sills of the rights to a song he had written. (Id.)

At some point prior to June 2004, Sills appears to have written to the Foundation expressing displeasure with some aspect of his experience with the organization. The source of plaintiff's displeasure is unclear, but in June 2004, he received a responsive letter from the Chairman of the Foundation, Frederick J. Ryan, Jr., assuring him that Foundation took his

---

[3] Plaintiff purports to attach, as Exhibit F to his declaration, a letter to this effect; no such letter appears in plaintiff's submissions, however. Nevertheless, in the absence of any contradictory evidence, plaintiff's recitation of this fact is taken as true for purposes of this motion.

concerns very seriously. (Sills Decl. Ex. I.) Ryan further noted that Sills had been one of the Foundation's "most loyal supporters," and asked him to "reconsider his decision and continue to participate in the Presidential Learning Center and Foundation." (Id.) The Foundation, Ryan wrote, was "honored to have [Sills] associated with [its] programs and wish[ed] to continue the great work [it] is able to do with [his] generous donations." (Id.) Ryan alerted Sills to a possible reception in New York during the Republican National Convention and an Air Force One Gala, hosted by the Foundation's "Trustee and Friend, Rudy Giuliani, also in New York," with invitations promised to follow. (Id.) Ryan also asked that Sills meet with him and the new director of development in New York to discuss how the Foundation could recognize his support for the Presidential Learning Center. (Id.)

It is unclear whether any of the events or meetings mentioned in Ryan's letter ever occurred, and if so, whether Sills attended, but the letter does appear to have had the desired effect. Just a month later, in August 2004, Sills donated $100,000 to the Foundation, followed by another $100,000 donation the following July. (Id. ¶ 30; Id. Ex. K.) Sills alleges that these donations were made after solicitations and fundraising efforts by the Foundation. (Id. ¶ 30.) As with the earlier donations, these were made for the sole purpose of establishing various educational programs within the Presidential Learning Center. (Compl. ¶ 14.) It is these two donations which Sills believes were not used in accordance with his specific intent and which form the heart of this action.

Plaintiff commenced litigation in the Supreme Court of the State of New York for New York County in an effort to obtain an accounting of the manner in which defendant used his final two $100,000 donations, which he contends were improperly used for "general purposes" on behalf of the Presidential Learning Center, rather than for the agreed-upon educational programs.

5

Plaintiff also seeks compensatory damages, contending that these donations were made in reliance on defendant's representations that the money would be used in accordance with plaintiff's donative intent. Finally, plaintiff seeks an award of costs and fees expended in pursuing this litigation. Defendant removed the case to this Court on grounds of diversity of citizenship and now moves to dismiss for lack of personal jurisdiction or, in the alternative, to transfer the case to the Central District of California.

## DISCUSSION

### I.    Subject Matter Jurisdiction

As a threshold matter, although not raised by either party, this Court's is obliged to consider whether subject matter jurisdiction exists, where as here, it is not immediately apparent that it does. See Petereit v. S.B. Thomas, Inc., 63 F.3d 1169, 1175 (2d Cir. 1995). The case is in this Court after being removed by defendant, pursuant to 28 U.S.C. § 1441, from New York state court predicated on diversity of citizenship. Subject matter jurisdiction exists in a diversity case when the parties are citizens of different states and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332. Defendant, as the removing party, bears the burden of showing a reasonable probability that the requirements for diversity jurisdiction are satisfied. Mehlenbacher v. Akzo Nobel Salt, Inc., 216 F.3d 291, 295-96 (2d Cir. 2000).

Here, the first requirement is easily met: plaintiff is a citizen of New York and defendant of California. In evaluating whether the jurisdictional amount is met, a court looks first to the complaint and then to the notice of removal. Id. at 296. If those are "inconclusive as to the value of the controversy, the court may look to the moving papers." Ava Acupuncture P.C. v. State Farm Mut. Auto. Ins. Co., 592 F. Supp. 2d 522, 527 (S.D.N.Y. 2008) (internal quotations omitted). Plaintiff's complaint seeks: first, an accounting for $200,000 worth of donations;

6

second, unspecified compensatory damages; and third, a minimum of $100,000 in attorney's fees. (Complt. ¶¶ 8-25.) Defendant's notice of removal avers simply an amount in controversy in excess of $75,000. (Notice of Removal ¶ 4.)

Although beyond the request for attorney's fees – which are not included in determining the amount in controversy unless recoverable as a matter of right through contractual or statutory authority, neither of which is alleged to be present here, Givens v. W. T. Grant Co., 457 F.2d 612, 615 (2d Cir. 1972), vacated on other grounds 409 U.S. 56 (1972); Bernshteyn v. Feldman, No. 04 Civ. 1774, 2006 WL 2516514, at *6 (S.D.N.Y. Aug. 29, 2006) – plaintiff does not explicitly reveal the amount he seeks through this litigation, it is nonetheless clear from the complaint that the amount in controversy is $200,000, the entirety of the contested donations and well in excess of the jurisdictional minimum.

An action for an accounting alone, even without a concomitant request for monetary relief, can satisfy the amount in controversy requirement. See DiTolla v. Doral Dental IPA of New York, 469 F.3d 271 (2d Cir. 2006). In such a case, the amount is controversy is not necessarily the value of the amount to be accounted for. Rather, as with requests for other forms of equitable relief, "the amount in controversy is measured by the value of the object of the litigation." Id. at 276, citing Hunt v. Washington State Apple Adver. Comm'n, 432 U.S. 333 (1977). This value is measured from the plaintiff's standpoint and is "the value of the suit's intended benefit or the value of the right being protected or the injury being averted . . . ." Correspondent Services Corp. v. First Equities Corp. of Florida, 442 F.3d 767, 769 (2d Cir. 2006), quoting Kheel v. Port of New York Authority, 457 F.2d 46, 49 (2d Cir. 1972).

The object of this litigation – what plaintiff seeks to protect – is the donations that plaintiff contends were not used as specified, with a total value of $200,000. Additionally, the

7

amount in controversy requirement does not rest solely on a demand for an accounting; plaintiff also requests compensatory damages.  Although plaintiff's ad damnum is silent as to the amount sought, the context in which this demand arises leaves a strong inference that plaintiff requests reimbursement of the entire $200,000 worth of contested donations, which were allegedly given in reliance on representations that the monies would be used as plaintiff desired.  Indeed, this is how defendant reads plaintiff's demand (see D. Mem. 1), and plaintiff does not contest that reading.

By all accounts, then, the amount in controversy is $200,000.  Since subject matter jurisdiction exists, the issues raised by the parties concerning personal jurisdiction and transfer of venue may be addressed.

## II.   Personal Jurisdiction

On a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), plaintiff bears the burden of establishing that the court has jurisdiction over the defendant.  In re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 206 (2d Cir. 2003).  Where, as here, the parties have not engaged in discovery, "a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith legally sufficient allegations of jurisdiction – i.e., by making a *prima facie* showing of jurisdiction."  Jazini v. Nissan Motors Co., 148 F.3d 181, 184 (2d Cir. 1998).  On a Rule 12(b)(2) motion, a court is not limited to the four corners of the complaint, but may also rely on the parties' affidavits.  Cyberscan Tech., Inc. v. Sema Ltd., 06 Civ. 526, 2006 WL 3690651, at *2 (S.D.N.Y. Dec. 13, 2006), quoting Marine Midland Bank v. Miller, 664 F.2d 899, 904 (2d Cir. 1981).  In assessing whether the defendant is subject to this court's jurisdiction, all allegations in the pleadings and affidavits must be construed in a light most favorable to the plaintiff and all doubts resolved in

8

plaintiff's favor.  PDK Labs, Inc. v. Friedlander, 103 F.3d 1105, 1108 (2d Cir. 1997).

A federal court sitting in diversity applies the personal jurisdiction rules of the forum state, in this case New York.  Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 784 (2d Cir. 1999).  If jurisdiction is proper under New York law, it must then be determined whether asserting jurisdiction would comport with federal due process.  Id.

### A.    New York's Long-Arm Jurisdiction

Rule 302(a)(1) of the New York Civil Practice Law and Rules provides for long-arm jurisdiction over a non-domiciliary who "in person or through an agent . . . transacts any business within the state," C.P.L.R. 302(a)(1), where the cause of action arises from that transaction of business, Johnson v. Ward, 4 N.Y.3d 516, 519 (2005).  Both elements are satisfied here.

### 1.    Transaction of Business

"The overriding criterion necessary to establish a transaction of business is some act by which the defendant purposefully avails itself of the privilege of conducting activities within New York."  Ehrenfeld v. Bin Mahfouz, 9 N.Y.3d 501, 508 (2007).  "When a defendant engages in purposeful activity here, personal jurisdiction is proper because it has invoked the benefits and protections of [New York's] laws."  Id.  "Not all purposeful activity, however, constitutes a 'transaction of business' within the meaning of CPLR 302(a)(1)," Fischbarg v. Doucet, 9 N.Y.3d 375, 380 (2007), and jurisdiction will not extend to cover defendants with nothing more than petty contacts to the state.  Id. (citing examples of insufficient contacts as telephoning a single order of goods to be shipped from New York to another state, the transitory presence of a corporate officer, or communications and shipments sent here by an out-of-state doctor acting as a consultant to plaintiff's New York doctor).  That said, a single purposeful transaction in New

9

York may suffice to confer jurisdiction, Grand River Enters. Six Nations, Ltd. v. Pryor, 425 F.3d 158, 166 (2d Cir. 2005), as can "[c]umulative minor activities that, individually, may be insufficient, . . . as long as the cumulative effect creates a significant presence within the state," Freeplay Music, Inc. v. Cox Radio, Inc., No. 04 Civ. 5238, 2005 WL 1500896, at *5 (S.D.N.Y. June 23, 2005).

In the end, determining whether a defendant has transacted sufficient business in New York to be subject to its jurisdiction is assessed on the totality of the circumstances surrounding the foreign defendant's interactions with the state. Bank Brussels Lambert, 171 F.3d at 787. Although the totality of the circumstances is a necessarily murky standard by which it is "impossible to precisely fix those acts that constitute a transaction of business," the final analysis is guided by examining "the quality of the defendants' New York contacts." Fischbarg, 9 N.Y.3d at 380. In every instance, the showing required to demonstrate a "transaction of business" sufficient for Rule 302(a)(1) jurisdiction is considerably less than is necessary to demonstrate that a defendant is "doing business" in New York in a systematic and continuous way so as to be subjected to Rule 301 general jurisdiction, Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.3d 55, 58 (2d Cir. 1985), and Rule 302(a)(1) jurisdiction "requires only a minimal quantity of activity, provided that it is of the right nature and quality," Manhattan Life Ins. Co. v. A.J. Stratton Syndicate (No. 782), 731 F. Supp. 587, 592 (S.D.N.Y. 1990).

The totality of the circumstances present here establish the Foundation's transaction of business in New York through its concerted and purposeful campaign of solicitation of charitable donations from Sills.[4] The thrust of the Foundation's argument to the contrary is that

---

[4] The Foundation attempts to circumvent the totality of the circumstances by relying on what it terms the "traditional factors" used to assess whether a party has transacted business in

10

even if the donations at issue "were made in response to telephone calls or correspondence,"

such solicitation cannot form the basis of personal jurisdiction in New York.  (D. Reply 6.)  Even

"mailings and telephone calls can . . . confer personal jurisdiction if defendant[] conducted these

activities in such a manner as to 'project' [itself] into New York in order to 'purposely avail'

[itself] of the benefits of doing business there."  Jaisan, Inc. v. Sullivan, No. 96 Civ. 4336, 1997

WL 86402, at *3 (S.D.N.Y. Feb. 28, 1997).  But the Foundation's New York-based interactions

with Sills were not limited to corresponding from California.  The Foundation's executive

director and development director traveled to New York to solicit Sills in person for donations,

and the Foundation sponsored fundraising events in New York to which Sills was invited.

In Fischbarg, the New York Court of Appeals found the defendants to have transacted

business in New York by soliciting transactions from California.  In that case, defendants, from

California, contacted plaintiff, an attorney in New York, via telephone, facsimile, mail and e-

mail correspondence, through which the defendant solicited and ultimately retained the

plaintiff's services in connection with a litigation in Oregon.  9 N.Y.3d at 377-78.  The Court of

---

the state.  (D. Mem. 7.)  Because jurisdiction under 302(a)(1) is frequently invoked for matters
stemming from contractual relations, courts have articulated several indicia of "transacting
business" centered around the nature of the parties' contractual relationship.  E.g., Agency Rent
A Car System v. Grand Rent A Car Corp., 98 F.3d 25, 29 (2d Cir. 1996) (looking to factors such
as: whether there is an ongoing contractual relationship; where the contract was negotiated and
executed; any choice of law provision; and whether the contract contemplates notices or
payments to be sent to the forum state).  The Foundation latches onto these indicia to support its
argument that it has not "transacted business" in New York because "no contract existed
between the [p]arties."  (D. Reply 7; see also D. Mem. 7 ("[N]o ongoing contractual relationship
with the Foundation has been alleged – and none exists.  Thus, none of the traditional factors
considered in determining whether a party is amenable to jurisdiction under [Rule] 302(a)(1) are
present.").  But it is clear that these indicia are no more than guideposts and are not designed to
apply to every situation, for section 302(a)(2) jurisdiction is not limited to strictly contractual
situations.  See, e.g., Bank Brussels Lambert, 171 F.3d at 787 n.3.  Indeed, even cases relying
upon the contractual indicia emphasize the need to look at the totality of the circumstances.  E.g.,
Agency Rent A Car System, 98 F.3d at 29.

Appeals found that defendants, though never physically present in New York, had transacted business here, explaining that:

> when defendants projected themselves into New York via telephone to solicit plaintiff's legal services they necessarily contemplated establishing a continuing attorney-client relationship with him. Having established such a relationship and repeatedly projecting themselves into New York – via telephone, mail, e-mail and facsimile – to advance their legal position in the Oregon action through communications with plaintiff here, defendants purposefully availed themselves of the benefits and protections of New York's laws governing lawyers.

Fischbarg, 9 N.Y.3d at 385. The two factors emphasized in Fischbarg – the ongoing nature of the relationship and defendant's purposeful availment of the laws of New York – are both present here, albeit in different manifestations.

The Foundation endeavored to cultivate an ongoing relationship with Sills through a campaign of solicitation in New York by which it actively projected itself into the state, not only metaphorically (as in Fischbarg), but by physical presence as well. Sills alleges that he received, in New York, numerous letter and telephone solicitations from defendant from 1997 onward. Initially, Sills may have received solicitations from the Foundation's mass mailing list. Once he became a major donor – which would have occurred, at a minimum, with his first $100,000 donation in 2000 – he was likely taken off of the mass mailing list and received more targeted solicitations. (Blackwood Decl. ¶ 10.) The Foundation, through board member Steve Forbes, held a fundraiser in New York, to which Sills was invited, which he attended, and after which he made the first of several $100,000 donations to the Foundation.[5] Representatives of the

---

[5] Defendant does not challenge plaintiff's assertions that Forbes, as a board member of the Foundation, hosted this event with the authority of the Foundation, which relied upon Forbes to conduct fundraising activities. (See compl. ¶ 10; P. Mem. 12) Accordingly, plaintiff has adequately alleged an agency relationship, making this New York fundraiser properly

12

Foundation – the executive director and director of development – traveled to New York to meet with potential donors, had dinner with Sills and went to his residence to personally introduce themselves in aid of the Foundation's general fundraising purposes.

Sills was told that his donations singlehandedly enabled the Foundation's educational programs for a number of years.  In response to his intimation that he may cease donating, the Foundation's chairman wrote to Sills in New York and begged him to reconsider, touting the sizable impact his support for the Foundation had already achieved and expressing a desire to "continue the great work [the Foundation is] able to do with [his] generous donations." (Sills Decl. Ex. I.) Sills alleges that many of his donations, including the two large $100,000 donations at issue, were given in response to defendant's solicitation efforts.  (Sills Decl. ¶¶ 15-23, 25, 27-28, 30.)  Through all of the above, the Foundation engaged in a purposeful – and successful – attempt to establish and maintain an ongoing and substantial "business" relationship with Sills.[6]  All of these New York interactions with Sills can fairly be characterized

---

attributable to the Foundation.  See Cavu Releasing, LLC v. Fries, 419 F. Supp. 2d 388, 392 (S.D.N.Y. 2005) (agency relationship for jurisdictional purposes requires that agent acted in the state for benefit of principle, with principle's knowledge, and where the parties' respective roles give principle ability to influence acts of agent).

[6]    Although solicitation may not be considered "business" in the traditional sense, solicitations and fundraising are crucial aspects of the business of a charitable organization such as the Foundation. Cf. Zucker v. Baker, 231 N.Y.S.2d 332, 335-36 (N.Y. Sup. Ct. Queens Co. 1962) (finding solicitation of funds in New York for use in promoting Massachuset-based M.I.T.'s charitable purposes to be "doing business" (in a Rule 301 sense) in New York: "the gathering of [funds to conduct charitable activities] is as integral a part of an institution such as M.I.T., as the very activities for which it is organized and which it seeks to improve"); but cf. Nelson v. Mass. Gen. Hosp., No. 04-cv-5382, 2007 WL 2781241, at *23-24 (S.D.N.Y. Sept. 20, 2007) (giving charitable fundraising activities less weight than those activities the hospital was organized to do in assessing whether hospital was "doing business" (again, in a Rule 301 sense) in New York).  Fundraising is clearly important to the Foundation; indeed, seventy-two percent of its revenues in 2004 and 2005 came from private donations.  (Blackwood Decl. ¶ 12.) Moreover, the term "business" in the context of Rule 302(a)(1) is construed broadly to

as furthering the Foundation's fundraising efforts, which, because of the nature of its business, necessarily invokes the privileges of New York law.

Indeed, the Foundation is registered as a charitable organization with the State of New York, pursuant to Executive Law Article 7-A, which requires all charitable organizations to register with the state before soliciting contributions here.   See N.Y. Exec. Law §§ 171-a-177. Having so registered, the Foundation unmistakably purposefully availed itself of the privileges and benefits of New York laws; absent this registration, the Foundation would be prohibited from soliciting contributions from any person or organization anywhere within New York.   See Abrams v. New York Found. for the Homeless, Inc., 562 N.Y.S.2d 325 (N.Y. Sup. Ct. N.Y. Co. 1990) (issuing preliminary injunction against solicitations by unregistered charity).   While this limited form of charitable registration may not support a finding of "doing business," sufficient to subject a charitable organization to the general jurisdiction of this state for any and all unrelated causes of actions, see Nelson, 2007 WL 2781241, at *26, the registration is jurisdictionally significant in the present context and amply supports a finding of the requisite purposeful availment in the Foundation's solicitation of Sills.[7]

---

"encompass more than profit seeking activities," and the ultimate test for "transacting business" remains whether defendant has engaged in purposeful activity within the state. Madden v. Int'l Ass'n of Heat & Frost Insulators and Asbestos Workers, 889 F. Supp. 707, 710 (S.D.N.Y. 1995) (citing various non-commercial forms of transacting business under the statute).

[7] For this reason alone, O'Brien v. Hackensack Univ. Med. Ctr., 760 N.Y.S.2d 425 (1st Dep't 2003) does not compel a different result.   That case stated:

> mere solicitation of business within the state does not constitute transaction of business within the state, unless the solicitation in New York is supplemented by business transactions occurring in the state, or the solicitation is accompanying by a fair measure of the defendant's permanence and continuity in New York which establishes a New York presence.

That said, it may not necessarily be the case that a registered charity "transacts business" in New York anytime it solicits a contribution. But the overall nature and quality of the Foundation's interactions with Sills, which involved sustained and targeted solicitation – not only through correspondence sent in from out-of-state, but also by in person contact within the state – easily push it over the threshold of transacting business here. See Fishcbarg, 9 N.Y.3d at 382 ("[E]ven when physical presence is lacking, jurisdiction may still be proper if the defendant on his or her own initiative projects himself or herself into this state to engage in a sustained and substantial transaction of business." (internal quotations and punctuation marks omitted)).

### 2. Nexus

The second requirement for jurisdiction under C.P.L.R. 302(a)(1) is that the claims asserted arise from the New York based transaction of business. "[A] claim arises from a particular transaction when there is some articulable nexus between the business transacted and the cause of action sued upon, or when there is a substantial relationship between the transaction and the claim asserted." Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC, 450 F.3d 100, 103 (2d Cir. 2006) (internal citations and quotations omitted); accord, Sunward Elecs., Inc. v. McDonald, 362 F.3d 17, 24 (2d Cir. 2004). The connection between the transaction of business

---

760 N.Y.S.2d at 427 (internal citations omitted). The charitable context surrounding the Foundation's solicitation of Sills distinguishes the activities from "mere" solicitation and imputes them with unmistakably purposeful availment of New York's laws. Moreover, the fundamental soundness of O'Brien's statement is questionable, given that it relies upon cases discussing the more stringent Rule 301 "doing business" standard in fashioning the second half of the test (i.e., concerning permanence and continuity). Id., citing Cardone v. Jiminy Peak, Inc., 667 N.Y.S.2d 82 (3d Dep't 1997) and Chamberlain v. Jiminy Peak, 575 N.Y.S.2d 410 (3d Dep't 1991). In any event, regardless of whether defendant's contacts here would rise to the level of permanence and continuity envisioned by O'Brien, the case is distinguishable for the additional reason that, unlike the defendant in that case, the Foundation physically entered New York to solicit Sills.

and the cause of action must be more than coincidental or tangential.  Sole Resort, 450 F.3d at

100-01.  The inquiry to be undertaken is "whether the parties' activities in New York and the

asserted claim are 'substantially related.'"  Id. at 105; see also id. at 101 (noting that claims

dismissed for lack of a sufficient jurisdictional nexus involved instances where the relationship

between the transaction of business and the claim was, at best, tangential).

Here they plainly are.  Sills' claims directly relate to the Foundation's repeated

solicitation of him in New York, resulting in numerous and substantial donations, two of which

form the heart of this lawsuit.  In assessing whether the requisite nexus exists, courts are

instructed to look to the "'totality of the circumstances surrounding defendants' activities in New

York in connection with the matter giving rise to the lawsuit."  PDK Labs, 103 F.3d at1109,

quoting Hoffritz, 763 F.3d at 60.  It is in part the parties' ongoing relationship – in which, as

plaintiff aptly puts it, "[d]efendant intentionally pursued plaintiff within New York for a period

of eight years to obtain significant financial support . . . [and] purposely sought to maintain a

relationship with plaintiff in the hope that he would remain a major financial contributor" (P.

Mem. 18) – that led to the contested donations.

The Foundation mysteriously asserts that Sills fails to allege any facts of solicitation

pertaining to the 2004 and 2005 donations at issue, noting that the exhibits attached to Sills's

declaration consist of the Foundation's thank-you notes to Sills.  (D. Reply 6.)  At this stage in

the proceedings, prior to any jurisdictional discovery, plaintiff need only allege a prima facie

case of jurisdictional facts – that is, facts which, "if credited would suffice to establish

jurisdiction over the defendant."  Whitaker v. Am. Telecasting, Inc., 261 F.3d 196, 208 (2d Cir.

2001).  Exhibits or no, Sills has amply satisfied this limited burden with his allegation that the

"[t]wo final donations of $100,000 each were also made by me . . . after similar solicitations and

fund-raising efforts were in engaged in by [the] Foundation in the same manner as indicated above" (Sills Decl. ¶ 30), the manner indicated above being clearly identifiable as telephone calls and letters from the Foundation to Sills in New York City seeking additional donations (id. ¶ 25). Moreover, the 2004 donation came just a month after the chairman's letter, sent to Sills in New York, encouraging him to continue to support the Foundation.

The Foundation's bald assertion that however it used the donations in California "bears no relationship whatsoever to any alleged solicitation in New York" (D. Reply 7) is unconvincing. This interpretation would improperly "lead to a finding of no jurisdiction over defendant[] merely on the basis that the acts alleged in the complaint did not take place in New York." Hoffritz, 763 F.2d at 59. This lawsuit, stemming from plaintiff's displeasure with the way his donations were used, is not a mere tangential by product of the Foundation's New York-based transaction of business; it is a direct product of its successful endeavor to procure plaintiff's beneficence. The requisite nexus exists and accordingly, plaintiff has fully satisfied the requirements of jurisdiction under C.P.L.R. 302(a)(1).[8]

## B.    Due Process

The exercise of jurisdiction must also comport with due process. This "requires only that defendants have certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Best Van Lines, Inc. v. Walker, 490 F.3d 239, 242 (2d Cir. 2007) (alteration in original), quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). "The crucial question is whether the

---

[8] Because C.P.L.R. 302(a)(1) long-arm jurisdiction exists, it is not necessary to determine whether, as plaintiff argues, defendant is also subject to general jurisdiction under C.P.L.R. 301. E.g., Grand River Enters., 425 F.3d at 167 n.2.

defendant has 'purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws,' 'such that [the defendant] should reasonably anticipate being haled into court there.'" Id. at 242-43 (internal citation omitted and alterations in original), quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474-75 (1985).

As is apparent from the recitation of the due process standard, "[s]atisfaction of the [Rule] 302(a)(1) criteria will generally meet federal due-process requirements," Cyberscan Tech., 2006 WL 3690651, at *6; accord, D.H. Blair & Co., Inc. v. Gottdiener, 462 F.3d 95, 105 (2d Cir. 2006), as is the case here. Having purposefully availed itself of the privilege of soliciting charitable donations in New York by registering with the state attorney general's office, the Foundation cannot now feign surprise or cry foul when one of its New York-based donors, who was the recipient of its ongoing and active solicitation efforts in New York, seeks to enforce his rights here. Accordingly, the exercise of jurisdiction over the Foundation fully comports with constitutional due process guarantees and defendant's motion to dismiss for lack of personal jurisdiction is denied.

## III.    Transfer of Venue

Under 28 U.S.C. § 1404, a court may transfer a case "in the interest of justice" "[f]or the convenience of the parties and witnesses . . . to any other district or division where it might have been brought." There is no dispute that this action could have been brought in the Central District of California, where defendant resides and to which defendant seeks to transfer the case. The issue is thus whether the requested transfer is justified on grounds of convenience. "District courts have broad discretion in making determinations of convenience under Section 1404(a) and notions of convenience and fairness are considered on a case-by-case basis." D.H. Blair &

Co., 462 F.3d at 106. To guide the assessment, courts balance a number of factors, including:

> (1) the locus of operative facts; (2) convenience of the parties; (3) the convenience of the witnesses; (4) the location of the relevant documents and relative ease of proof; (5) the relative means of the parties; (6) the availability of process to compel unwilling witnesses; (7) a forum's familiarity with the governing law; (8) the weight accorded to plaintiff's choice of forum; and (9) trial efficacy and the interests of justice based upon the totality of the circumstances.

Am. Eagle Outfitters, Inc. v. Tala Bros. Corp., 457 F. Supp. 2d 474, 477 (S.D.N.Y. 2006). In weighing the balance of conveniences, significant weight must be accorded to plaintiff's choice of forum, and to prevail on a motion for transfer, defendant must demonstrate that the balance of conveniences does not merely favor a transfer, but does so decisively. Id. at 479-80; Astor Holdings, Inc. v. Roski, No. 01 Civ. 1905, 2002 WL 72936, at *12 (S.D.N.Y. Jan. 17, 2002). The party seeking a transfer bears the burden of demonstrating that the transfer is warranted and must make a "clear-cut showing that a transfer is in the best interests of the litigation" to satisfy that burden. Astor Holdings, 2002 WL 72936, at *12.

Here, the balance of factors does not decisively favor either side's desired venue and the Foundation has not met its burden to demonstrate otherwise. A number of the above factors immediately drop out of the convenience calculus. The convenience of the parties is a clear toss-up: plaintiff is located in New York and defendant in California. Both parties agree that the Foundation possess the majority of the documents relevant to this case and defendant asserts that those documents are located in California. But in this era, when documents are easily portable, "the location of documents and records is not a compelling consideration." Am. Eagle Outfitters, 457 F. Supp. 2d at 478 (internal quotations marks omitted). Additionally, as plaintiff points out, the issues presented by this case are not apt to require extensive document discovery,

rendering this factor even less significant.

The forum's familiarity with governing law is typically given little weight by federal courts, see Astor Holdings, Inc., 2002 WL 72936, and this result is particularly appropriate where, as here, there do not appear to be any complex issues of state law involved. The Foundation does not contend otherwise and concedes the neutrality of this factor.

Nor do the relative means of the parties tip the balance one way or another. The Foundation claims that the parties have relatively equal means. Sills challenges this assertion, noting that the Foundation's 2004 tax return lists over $145 million in assets; this fact, of course, says little about the Foundation's current means. Sills does not provide any concrete indication of his own assets relative to defendant's and by all indications, Sills is a wealthy individual. It would seem, then, that prosecution in either California or New York would not pose any significant hardship for either party and neither suggests that it would. In any event, the lack of any concrete comparison of the parties' relative means renders this factor largely inconsequential. See Am. Eagle Outfitters, 457 F. Supp. 2d at 478.

Several factors arguably point slightly in the direction of a transfer to California. The locus of operative facts is centered in California – e.g., the circumstances surrounding defendants's use of plaintiff's donations received in California and used to benefit the Learning Center, located in California – though, of course, significant preliminary events occurred here. As for witnesses, Sills identifies none beyond (presumably) himself. The Foundation lists four potential witnesses – its volunteer executive director, its financial controller, its chief financial officer, and its former director of development – and provides a general statement of the subjects to which each could testify. (Blackwood Decl. ¶¶ 2, 20-23.) The Foundation notes that the former director of development resides in California (id. ¶ 17), and it may be inferred that the

20

other three do as well: the financial controller and chief financial officer positions are

presumably held by employees of the Foundation (unlike the executive director position which is

explicitly stated to be on a volunteer basis), and defendant states that all of its employees work at

its headquarters in Simi Valley, California. (Id. ¶ 11.) Although the executive director is not

technically an employee, he executed his declaration in Simi Valley. (Id. at 7.) The Foundation

additionally raises the specter of other current and former employees, none of whom live in New

York (id. ¶ 23), but in the absence of any specific identification of who these people are, where

they are located, or what they would testify to, their shadowy presence is immaterial. See Am

Eagle Outfitters, 457 F. Supp. 2d at 478 (explaining requirement of an affidavit identifying

potential principal witnesses along with a statement of the general substance of their expected

testimony).

This issue is thus focused on the Foundation's four proposed witnesses. Even assuming

that all four resided in California, the total number of witnesses is not so significant as to make

California a vastly superior forum. Moreover, at least some of the four appear to be party

witnesses, which are accorded less weight in the convenience balance than non-party witnesses.

Atlantic Recording Corp. v. BCD Music Group Inc., No. 08 Civ. 5201, 2009 WL 1390848, at *5

(S.D.N.Y. May 7, 2009). Finally, "[g]iven the likelihood . . . that the principal expenditure of

time in this action will be in the discovery phase, the inconvenience for parties and witnesses can

be minimized by a determination that the parties and the witnesses will be deposed in their

principal place of business . . . ." Am. Eagle Outfitters, 457 F. Supp. 2d at 478.

As regards the availability of process to compel unwilling witness, although the

Foundation correctly points out that this Court does not have the power to compel testimony

from any unwilling non-party witnesses residing in California, it has failed to indicate that any of

its anticipated non-party witnesses would in fact be unwilling to testify, rendering this factor neutral. Farberware Licensing Co. LLC v. Meyer Marketing Co., Ltd., No. 09 Civ. 2570, 2009 WL 1357956, at *2 (S.D.N.Y. May 14, 2009); Atlantic Recording Corp., 2009 WL 1390848, at *6. In any event, even if defendant's witnesses were unwilling, deposition testimony is an acceptable and complete alternative at this stage in the litigation. See Farberware Licensing, 2009 WL 1357956, at *2.

The combined total weight of the above factors in favor of the Central District of California is unimpressive and, at this time, does not come close to outweighing plaintiff's interest in litigating in his chosen forum of New York. While plaintiff's choice of forum is always accorded great deference, this deference takes on heightened import when, as here, "the plaintiff has sued in the plaintiff's home forum." Astor Holdings, 2002 WL 72936, at *13, citing (among other cases) Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988). The Foundation argues that Sills' choice of forum should be de-emphasized because the matter has little connection to New York. Not so. Although the locus of operative facts may be centered in California, this case is nevertheless amply connected to New York, as explained above, and significant events related to the matter occurred here. Even if the weight of the plaintiff's choice of forum were reduced, it would not be reduced to the point of shifting the balance decisively in defendant's favor.

Finally, the Foundation argues that interests of justice and notions of efficiency counsel litigation in California, but its arguments in support of this position merely rehash its other arguments, already discussed, for transferring the matter to that district – e.g., the location of alleged wrongdoing, witnesses and documents – and need not be discussed further except to note that New York's own interest in this matter cuts against defendant's appeals to notions of justice

as clearly favoring California.  Defendant wholly ignores the primary thrust of this factor, which

"relates primarily to issues of judicial economy."  Astor Holdings, 2002 WL 72936, at *13.  On

that point, there is no indication that there is any significant disparity in docket size or

congestion between the contending districts.  See In re Nematron Corp. Sec. Litig., 30 F. Supp.

2d 397, 407 (S.D.N.Y. 1998); Am. Eagle Outfitters, 457 F. Supp. 2d at 479.

In sum, a consideration of the relevant factors demonstrates that the balance is, on the

whole, relatively evenly distributed between plaintiff's chosen fora and defendant's.  New York

may be a less convenient venue for the Foundation to litigate in, but transfer to the Central

District of California would "merely . . . shift the inconvenience to" Sills, a decidedly improper

result.  Astor Holdings, 2002 WL 72936, at *13.  Accordingly, defendant's request to transfer

venue is denied and the case will remain in this Court for the time being.  Whether California is

more convenient for a trial can be decided if and when the matter progresses to that stage.

## CONCLUSION

For the foregoing reasons, defendant's motion (Doc. #3) to dismiss for lack of personal

jurisdiction or, in the alternative, to transfer to the central district of California is denied.

SO ORDERED.

Dated: New York, New York
     May 27, 2009

GERARD E. LYNCH
United States District Judge

23